JN:WPC
F.#2020R00073

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MAE MILLER,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

To Be Filed Under Seal

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF AN ARREST WARRANT

(18 U.S.C. § 1347)

No. 20-MJ-755

EASTERN DISTRICT OF NEW YORK, SS:

        Derek Stevens, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between June 2017 and October 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MAE MILLER, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the Medicare program and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody of, the Medicare program, in connection with the delivery of and payment for health care benefits, items, and services.

        (Title 18, United States Code, Sections 1347, 2 and 3551 et seq.)

## INTRODUCTION

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been employed as a Special Agent with HHS-OIG for approximately one year. During my tenure with HHS-OIG, I have participated in the investigation of numerous cases involving criminal health care fraud during which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and reviewed health care claims data, bank records, telephone records, medical records, invoices, and other business records. I am familiar with the laws and regulations related to the administration of the Medicare program and other health care benefit programs. I am currently assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs. I previously served as an investigator with the New York State Attorney General's Office for seven years. I spent five of those years on the Organized Crime Task Force investigating and prosecuting traditional and non-traditional organized crime organization, and I spent two years in the Auto Insurance Fraud Unit investigating and prosecuting auto insurance fraud.

2. I have been personally involved in the investigation relating to allegations of violations and attempted violations of 18 U.S.C. § 1347 (health care fraud) by the defendant MAE MILLER and others known and unknown.

3. I am familiar with the facts and circumstances set forth below from, among other things: (a) my personal participation in the investigation, (b) discussions with other law enforcement agents involved in this investigation, and (c) information obtained from witnesses, among other sources of evidence.

4. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts I learned from other law enforcement agents or civilian witnesses. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant MAE MILLER, I have not set forth each and every fact learned during the course of the investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents or the actions, statements, and conversations of others are reported herein, they are reported in sum and substance and in part.

## PROBABLE CAUSE

I.  Background

   A.  The Medicare Program

5. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

6. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

7. Medicare was subdivided into multiple parts. Medicare Part A covered health care services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B was the medical insurance program that covered, among other things, the cost of certain physicians' services and outpatient care, including mental

health services and occupational therapies. Generally, Medicare Part B covered these costs only if, among other requirements, the services were medically necessary and rendered by licensed medical doctors or other qualified health care providers.

8. Medical providers who performed medical services in connection with Medicare were required to apply for and receive a provider identification number ("PIN") or provider transaction access number ("PTAN") from Medicare. The PIN or PTAN allowed medical providers to submit bills, commonly known as "claims," to seek reimbursement for medical services that the providers had provided to beneficiaries.

9. Medical providers were authorized to submit claims to Medicare only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were actually rendered to the patient and were medically necessary.

10. Providers submitted claims to Medicare using billing codes, also called current procedural terminology or "CPT" codes, which were numbers referring to specific descriptions of the medical services provided to beneficiaries.

B. The Defendant and Related Entity

11. The defendant MAE MILLER was a licensed clinical social worker with a psychotherapy privilege in the State of New York, which allowed her patients to be reimbursed by their insurance providers for psychotherapy services performed by MILLER. MILLER resided at 137-02 224th Street in Laurelton, New York.

12. Care On Call New York, LLC ("Care On Call") was a business that provided mental health counseling and clinical social work services through home health

visits. The defendant MAE MILLER was the sole owner of Care On Call, which was also located at 137-02 224th Street in Laurelton, NY.

C. The Fraudulent Scheme

13. In or about and between approximately June 2017 and October 2019, the defendant MAE MILLER, together with others, engaged in a fraudulent scheme in which she submitted and caused to be submitted claims for reimbursement to Medicare for services she purportedly performed, when such services were in fact never performed. Specifically, the claims submitted by MILLER indicated that she provided various mental health services to beneficiaries at the beneficiaries' residences when, in fact, such services were never provided. MILLER submitted claims for home visits to beneficiaries who had never met MILLER, submitted claims for home visits to beneficiaries who were deceased on the purported date of service, billed for more than 24 hours of services rendered in a single day, and submitted claims for mental health testing services that were not part of a plan of care and frequently were not a kind of service which MILLER was qualified to provide.

14. The defendant MAE MILLER maintained a personal bank account at Bank 1, the identity of which is known to your affiant, with a bank account number ending in 0881 ("Account 1"). MILLER opened Account 1 on or about August 21, 2007, and she was the sole signatory on the account. MILLER also maintained a business bank account for Care On Call at Bank 1 with a bank account number ending in 3219 ("Account 2"). Account 2 was opened on or about October 26, 2017, and MILLER was the sole signatory for Account 2. Medicare Part B reimbursements totaling approximately $1,336,000 for fraudulent claims submitted by MILLER were deposited into Account 1.

i. Billing for Services Not Performed

15. Based on interviews conducted by law enforcement officers and other records reviewed during the course of the investigation, there is reason to believe that the defendant MAE MILLER submitted claims to Medicare in the amount of approximately $3,192,000 for mental health services and home health visits that she never performed, and that she received Medicare reimbursements of approximately $1,336,000 for these claims.

16. For example, law enforcement officers interviewed Patient-1, an individual whose identity is known to your affiant. Patient-1 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-1, including home health visits on or about April 3, 2018, April 4, 2018, August 29, 2018, October 25, 2018, January 18, 2019, March 7, 2019, March 9, 2019, May 9, 2019, and July 25, 2019. MILLER billed approximately $6,275 to Medicare and received Medicare reimbursements in the amount of approximately $4,048.55 for the above-described purported dates of service.

17. Law enforcement officers interviewed Patient-2, an individual whose identity is known to your affiant. Patient-2 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-2, including home health visits on or about January 17, 2019, January 18, 2019, February 22, 2019, February 23, 2019, April 25, 2019, and August 9, 2019. MILLER billed approximately $3,500 to Medicare and received Medicare

reimbursements in the total amount of approximately $1,657.81 for the above-described purported dates of service.

18. Law enforcement officers interviewed Patient-3, an individual whose identity is known to your affiant. Patient-3 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-3, including home health visits on or about January 17, 2019, January 18, 2019, February 22, 2019, February 23, 2019, and April 25, 2019. MILLER billed approximately $2,775 to Medicare and received Medicare reimbursements in the total amount of approximately $734.72 for the above-described purported dates of service.

19. Law enforcement officers interviewed Patient-4, an individual whose identity is known to your affiant. Patient-4 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-4, including home health visits on or about January 18, 2019, January 24, 2019, January 25, 2019, April 10, 2019, April 11, 2019, June 27, 2019, and September 5, 2019. MILLER billed approximately $4,525 to Medicare and received Medicare reimbursements in the total amount of approximately $1,981.99 for the above-described purported dates of service.

20. Law enforcement officers interviewed Patient-5, an individual whose identity is known to your affiant. Patient-5 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of

Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-5, including home health visits on or about January 18, 2019, January 24, 2019, January 25, 2019, April 10, 2019, April 11, 2019, June 27, 2019, and September 5, 2019. MILLER billed approximately $4,525 and received Medicare reimbursements in the total amount of approximately $2,040.79 for the above-described purported dates of service.

21. Law enforcement officers interviewed Patient-6, an individual whose identity is known to your affiant. Patient-6 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-6, including home health visits on or about January 17, 2019 and January 18, 2019. MILLER billed approximately $1,350 to Medicare and received Medicare reimbursements in the total amount of approximately $757.02 for the above-described purported dates of service.

22. Law enforcement officers interviewed Patient-7, an individual whose identity is known to your affiant. Patient-7 was a resident of Far Rockaway in Queens, New York, and purportedly received services from the defendant MAE MILLER. A review of Medicare claims data indicated that MILLER submitted claims for reimbursement for various mental health services for Patient-7, including home health visits on or about January 17, 2019 and January 18, 2019. MILLER submitted claims in the amount of approximately $1,350 to Medicare and received Medicare reimbursements in the total amount of approximately $765.01 for the above-described purported dates of service.

23. Patient-1, Patient-2, Patient-3, Patient-4, Patient-5, Patient-6, and Patient-7 all told law enforcement officers, in sum and substance and in part, that they did not know the defendant MAE MILLER and had never received any mental health services from MILLER. Furthermore Patient-1, Patient-2, Patient-3, Patient-6, and Patient-7 told law enforcement officers, in sum and substance and in part, that they had never received any home health visits.

ii. Billing for Services Purportedly Performed on Deceased Patients

24. A review of Medicare claims data indicated that the defendant MAE MILLER submitted claims to Medicare in the amount of approximately $37,050 for home health visits to beneficiaries who were deceased on the purported dates of service, and received no Medicare reimbursements for these claims. In total, MILLER submitted claims on behalf of approximately twenty beneficiaries who were deceased on the date of their purported home health visits. Because CMS was notified by the Social Security Administration of the purported patients' deaths, the reimbursements MILLER sought were rejected.

25. Examples of claims that the defendant MAE MILLER submitted for deceased beneficiaries included billing for home visits on or about:

    a. June 14, 2017 with respect to Patient-8, whose identity is known to your affiant, and who died six months earlier, on or about December 20, 2016;

    b. October 19, 2017 with respect to Patient-9, whose identity is known to your affiant, and who died more than 17 years earlier, on or about March 28, 1999;

    c. April, 17, 2018 with respect to Patient-10, whose identity is known to your affiant, and who died 11 months earlier, on or about May 8, 2017;

      d. October 31, 2018, with respect to Patient-11, whose identity is known to your affiant, and who died 11 years earlier, on or about September 25, 2007; and

      e. November 1, 2018, with respect to Patient-12, whose identity is known to your affiant, and who died more than one year earlier, on or about June 28, 2017.

    iii. <u>Billing for More Than 24 Hours' Worth of Services in a Single Day</u>

26. A review of Medicare claims data revealed that over half of the claims submitted by the defendant MAE MILLER from in or about and between June 2017 and October 2019 indicated that she had worked more than 24 hours in a single day. When submitting claims, MILLER used timed CPT codes to indicate which services she purportedly rendered. Each claim submitted under a timed CPT code corresponded with a duration of time specified by CMS guidelines. For example, one unit billed under code 96118—a type of code used to indicate the performance of neurological testing—corresponded with sixty minutes of services rendered. In total, MILLER billed approximately $2,604,577.00 to Medicare and received Medicare reimbursements in the amount of approximately $1,181,260.52 from claims for days in which she purportedly rendered more than 24 hours of services in a single day, including for the following claims:

      a. 122.63 hours for purported work performed on or about October 18, 2018 for 18 patients;

      b. 230.13 hours for purported work performed on or about January 17, 2019 for 130 patients, including purported visits to Patient-6 and Patient-7;

      c. 255.25 hours for purported work performed on or about January 18, 2019 for 172 patients, including purported visits to Patient-1, Patient-2, Patient-3, Patient-4, Patient-5, Patient-6, and Patient-7;

    d. 127.5 hours for purported work performed on or about February 27, 2019 for 22 patients;

    e. 106.63 hours for purported work performed on or about March 29, 2019 for 15 patients;

    f. 154.63 hours for purported work performed on or about April 11, 2019 for 25 patients, including purported visits to Patient-4 and Patient-5;

    g. 121.13 hours for purported work performed on or about June 27, 2019 for 16 patients, including purported visits to Patient-4 and Patient-5;

    h. 162.25 hours for purported work performed on or about July 25, 2019 for 22 patients, including purported visits to Patient-1; and

    i. 143.13 hours for purported work performed on or about September 5, 2019 for 22 patients, including purported visits to Patient-4 and Patient-5.

    iv. <u>Invalid Claims Submitted for Psychiatric, Psychological, and Neurological Testing</u>

27. A review of the Medicare claims submitted by the defendant MAE MILLER revealed that, between approximately June 2017 and October 2019, MILLER submitted nearly 8,000 claims for a variety of psychological, neuropsychological, and psychiatric testing services, including claims for Patient-1, Patient-2, Patient-3, Patient-4, Patient-5, Patient-6, Patient-7, Patient-8, Patient-9, Patient-10, Patient-11 and Patient-12. These claims were fraudulent because, among other reasons, the services purportedly rendered were not part of an individualized treatment plan, the patients were usually referred by a provider who had no relationship with them, and frequently the claims were for a type of service which MILLER was not qualified to provide or bill for. In total, MILLER billed

approximately $2,902,626 and received Medicare reimbursements of approximately $1,224,129.40 for these claims.

28. Providers of psychological, neuropsychological, and psychiatric testing are generally required to create individualized patient treatment plans. In addition, this kind of testing involves coordination and communication between the provider and the beneficiary's treating physician regarding the beneficiary's diagnoses, goals, and progress. In the case of 80% of the patients, the purported referring physician for the claims submitted by the defendant MAE MILLER for these services was listed as Dr. Jane Doe, an individual whose identity is known to your affiant. When interviewed by law enforcement agents, however, Patient-1, Patient-2, Patient-3, Patient-4, Patient-5, Patient-6, and Patient-7 stated, in sum and substance and in part, that they did not know Dr. Jane Doe and had never received services from her. Dr. Jane Doe was also listed as the referring physician for patients who were deceased on their purported dates of service, including Patient-8, Patient-9, Patient-10, Patient-11 and Patient-12,.

29. Furthermore, the defendant MAE MILLER billed Medicare approximately $1,236,725 and received Medicare reimbursements of approximately $585,848.77 for claims submitted under the CPT code 96118, a code used to denote a type of neurological testing. Each unit billed under this code corresponded to one hour of neuropsychological testing by a psychologist or physician. According to a representative from National Government Services, the contractor which administers the Medicare program in New York State, MILLER was neither qualified to provide these services nor authorized to bill under this code. As a result, the approximately 1,899 claims she submitted under this

code, including claims for Patient-1, Patient-8, Patient-9, Patient-10, Patient-11, and Patient-12, were invalid.

## REQUEST FOR SEALING

I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the instant complaint and application and arrest warrant. The defendant MAE MILLER is currently at liberty, and it is respectfully submitted that sealing these documents is necessary to prevent the defendant from learning that a complaint has been filed and an arrest warrant issued, and to thus prevent the defendant from avoiding arrest and prosecution.

WHEREFORE, your deponent respectfully requests that the defendant MAE MILLER be dealt with according to law.

Derek Stevens
Special Agent
United States Department of Health and Human Services, Office of Inspector General

Sworn to before me by telephone this
2nd day of September 2020

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK